RUSSELL COUNTY SCHOOL BOARD

v.

STEPHEN L. ANDERSON

Record No. 880942

September 22, 1989

Present: Carrico, C.J., Compton, Stephenson, Russell, Thomas, Whiting, JJ.,
and Poff, Senior Justice

*James P. McElligott, Jr. (Scott S. Cairns; Randall B. Campbell; McGuire, Woods, Battle & Boothe*, on briefs), for appellant.

*Warren David Harless (Michael W. Smith; Patricia M. Powis; Christian, Barton, Epps, Brent & Chappell*, on brief), for appellee.

*Amicus Curiae*: Virginia School Boards Association (Kathleen S. Mehfoud; Lacy & Mehfoud, P.C., on brief), for appellant.

Justice Thomas delivered the opinion of the Court.

The Russell County School Board (the Board), appeals a decision of the Circuit Court of Russell County which reversed the Board's ruling that Stephen L. Anderson should be dismissed as a teacher. The Board contends that the trial court erred by, among other things, misapplying the "substantial evidence" test, relying upon matters outside the record, substituting its judgment for that of the Board, and applying erroneous legal principles. We agree that the trial court erred. Therefore, we will reverse its judgment.

In 1981, the Board hired Anderson as a teacher. In 1986, he was the subject of his first disciplinary proceeding. At that time, a fact-finding panel recommended that Anderson be placed on one year's probation and that he be observed in his classroom work. The Board accepted the panel's recommendation, placed Anderson on probation, and transferred him to the Lebanon Middle School for the school year 1986-1987 to teach seventh grade history and social studies.

Events which occurred at the Lebanon Middle School led to the present dispute. In April 1987, the superintendent of schools advised Anderson, in writing, that his conduct was unacceptable and that the superintendent would recommend his dismissal. The superintendent's letter read, in pertinent part, as follows:

> Pursuant to your request, I will provide the reasons for my recommendation that you be dismissed from your job as Social Studies Teacher at Lebanon Middle School.
>
> Your assignment for the History Day project, which you discussed with the History 7-4 class on February 6, 1987, was inappropriate, unprofessional, and improper.
>
> Throughout the 1986-87 school year, matters have been discussed and emphasized which foster an unhealthy attitude toward violence and violent topics. Throughout the 1986-87 school year, matters have been discussed and emphasized which are grossly inappropriate for the age level of the students involved.
>
> You were insubordinate in not obeying Mr. Bruce Warner's instructions to make available to Mr. Myrl Allen a copy of a tape recording of a parental conference with Mr. and Mrs. Myrl Allen concerning problems in your class.
>
> You have used disparaging language toward students during the 1986-87 school year. On numerous occasions, you have used abusive language at school in reference to other teachers and to the administration in such a manner as to be disruptive to the normal operation of the school.

> You have made threats against the principal and assistant principal of Lebanon Middle School in the presence of other faculty members.
>
> The behavior which caused you to be placed on probation for the 1986-87 school year has not been improved upon.

Anderson responded to the letter by requesting a fact-finding panel pursuant to Code § 22.1-310.

The panel held hearings on July 15 and 16, 1987, and filed its report on August 13, 1987, which set forth its findings of fact, conclusions, and recommendations. The panel did not agree that all of the superintendent's charges had been substantiated. It found only the following facts in favor of the superintendent:

1. that Anderson had suggested a skit in his history class in which a white girl and a white boy would conceive a child but the white girl would blame it on a black boy who would be lynched; the child would be born white and the community would feel that a great tragedy had occurred;

2. that Anderson had suggested a skit involving a Nazi rally;

3. that Anderson told one of his history classes how to make a "Molotov cocktail";

4. that on numerous occasions Anderson discussed guns and bombs with the students in his classes;

5. that Anderson referred to at least one female teacher as "female dog";

6. that Anderson referred to fake dog feces that he found in his classroom as "looking like the school board"; and

7. that Anderson said to another teacher that "it would be best to just shoot Mr. Warner [the principal] and Mr. Hartsock [the assistant principal] and be done with it."

The panel concluded on the basis of a 2-1 vote that there was "no basis for either the dismissal of the Teacher or the placing of the Teacher on probation."

On September 10, 1987, the Board rejected the panel's recommendation and voted to dismiss Anderson. Because the Board's decision was at variance with the panel's recommendation, the Board, pursuant to Code § 22.1-313(C), filed a written decision which included its rationale. The Board concluded, as follows:

1. that the skit proposed by Anderson in which a white girl and white boy would conceive a child, but a black boy would be blamed and lynched, even though it would later be proved that he was not the baby's father "was inappropriate and improper for students of [the age level of those in Anderson's class] and is grounds for dismissal";

2. that Anderson's instructing one of his history classes in the specifics of making a "Molotov Cocktail" was "seriously inappropriate," "unrelated to the coursework," and "grounds for dismissal";

3. that Anderson referred to "at least one female teacher as a female dog" and to one of his supervisors as a "pig." The Board considered Anderson's conduct in both instances wrong even if the statements were made to just one other teacher, "disruptive by their very nature to the professional association of the teachers," and "grounds for dismissal";

4. that when Anderson found fake dog feces in his classroom he stated it looked "like the school board." The Board found these remarks "unprofessional" and "inappropriate," improper no matter what person or organization might be the subject of the comparison, and "grounds for dismissal";

5. that Anderson's statement to another teacher that it would be best just to shoot the principal and assistant principal "and be done with it," was inappropriate and "not a proper way to criticize the actions of" the principal or assistant principal. And, that such remarks were disruptive to the school by their "very nature" and were "grounds for dismissal";

6. that Anderson asked one of his female students, "Have you gotten any tongue from anyone?" A remark which, from the Board's review of the panel record, was never denied by Anderson, but would have been denied were it untrue. And that this remark was "grounds for dismissal";

7. that when Anderson was told that some of the students in one of his classes had spat on a copy of the United States Constitution, his reply was that the students "had some sense." The Board found this charge uncontradicted in the panel record and considered it "very disruptive behavior on the part of " Anderson, "improper and inappropriate for children of [the age level involved]," and conduct which encouraged "a lack of respect for the Constitution and for authority." This was deemed "grounds for dismissal";

8. that Anderson stated that one of his female students had "used her sexual charms to keep the boys" in her class from voting in favor of a mock constitution. The Board considered the remark "inappropriate" for the "age level of the students involved" and "grounds for dismissal";

9. that Anderson permitted his students to hang drawings in his classroom which emphasized violence and disrespect for authority;[1]

10. that the incident which involved spitting on a copy of the Constitution was a type of discipline problem and that

[1] One drawing depicted Anderson riding a pig, carrying a Molotov cocktail, and saying "O.K. pig you're my only transportation out of here. So let's head for the school board office, and I'll give those guys who put me in the sewer a taste of a Molotov cocktail." Printed beneath that drawing was this statement "30 minutes later Mr. Anderson escapes the sewer. [H]e finds a shed nearby filled with glass bottles and gas. He makes a molotov cocktail and runs back outside. Then he finds a commy [sic] pig and jumps on it's [sic] back, and tells it to head for the school board office. But Mr. Anderson doesn't know that the school board staff is waiting on him with lots of weapons."

Another drawing depicted Anderson in military garb holding a weapon. The caption of that drawing was "Make my day Warner!" Warner was Anderson's principal. The expression "make my day" was from a series of motion pictures popular in the 1970's and 1980's. The phrase was typically uttered by the star character, a police detective, to criminals. The general meaning of the phrase was "do something to give me an excuse to kill you."

Anderson had been placed on probation the previous year because of a discipline problem;

11. and, that, "[t]he individual instances cited, taken singly or as part of a pattern, require that the teacher be dismissed for the good of the students and the school system."

Plainly, the Board, in reaching its decision to dismiss Anderson, agreed with some of the panel's findings; disagreed with others; and, in some instances, relied on the panel record to find its own facts in the first instance.

Anderson responded to the Board's decision by filing suit in which he alleged that

the Board did not have good cause to dismiss a continuing contract teacher based upon the Panel's findings of fact; that the Board found that [Anderson] should be dismissed for statements [Anderson] made which . . . were not disruptive to the normal operation of the school; and the Board's decision [was] unsupported by substantial evidence on the record combined as a whole.

The trial court agreed with Anderson.

In its final decree, dated May 17, 1988, the trial court ruled that the "decision to discharge [Anderson] was not supported by substantial evidence." The final decree incorporated by reference a letter opinion dated April 25, 1988. There, the trial court wrote that the facts found by the panel were "equal to facts found by a jury" and if the Board questioned the reasonableness of the panel's findings, the Board's option was to hold its own hearing and find its own facts.

The trial court next ruled that the Board's decision could not be based on anything other than the facts found by the panel. According to the trial court, because the Board had not conducted its own fact-finding hearing, its decision to dismiss Anderson could be upheld only if it was substantially supported by the following facts:

1. that Anderson suggested two skits with themes of "racial prejudice" or the influence of "charismatic leaders";

2. that Anderson discussed in the classroom "war, war casualties, guns, bombs, and related objects of destruction and violence in the classroom";

3. that Anderson in private conversation referred to "at least one female teacher as a female dog and to a male teacher as a pig"; and

4. that Anderson referred to "fake dog feces as resembling the Board."

The trial court ruled that the skits could not support Anderson's dismissal because they were never performed, having been rejected by the students. Further, the court reasoned, even if the skits had been accepted by the students, if they were inappropriate they would have been rejected by the principal. The trial court concluded that a tenured teacher should not be dismissed for suggesting topics which were subject to approval by the school administration.

The trial court also discounted the negative impact of Anderson's classroom discussions of war, violence, and bombs. According to the trial court, Anderson's remarks were "beneficial to the education of children to the realities of a terrible fact of life."

The trial court also did not think that derogatory remarks concerning colleagues were sufficient to support Anderson's dismissal. The trial court was of the view that the remarks were made in private and were protected by the First Amendment.

The trial court expressed more concern about Anderson's comment that the Board resembled dog feces. The court wrote as follows:

This to me is a very inappropriate act on the part of Anderson. It evinces a somewhat careless regard to his professional status and that of the Board. Not only is it vulgar, it also fosters an atmosphere around the students that those in authority within the system should not be admired or respected.

Despite its concern about Anderson's remarks, the trial court ruled that they were also protected by the First Amendment.

The trial court commented further that it was evident "that Mr. Anderson and his family members have found themselves in a position of confrontation with the administrators of the Russell

County School System. This is unfortunate and apparently has played a part in his dismissal." The trial court ordered the Board to reinstate Anderson.

The Board makes the following assignments of error:

1. The circuit court erred in holding that the school board was bound by the findings of the fact-finding panel.

2. The circuit court erred in reversing the decision of the school board that class projects involving premarital sex, inter-racial violence, fascism, Molotov cocktails and other controversial subjects were not appropriate for a seventh grade class.

3. The circuit court erred in holding that the First Amendment shields Anderson from discipline for calling a teacher a "bitch," the Superintendent for Instruction a "pig," the school board "feces," and for suggesting that his principal and vice principal be shot.

4. The circuit court erred in holding that "confrontation" between Anderson's family and the school system played a role in his dismissal, when such "confrontation" was not raised before the school board or in Anderson's amended bill of complaint.

5. The circuit court erred in holding that there was not substantial evidence supporting the school board's decision.

We will address each issue in turn.

■ In order to resolve the question whether panel fact findings must be accorded the weight given jury verdicts and are thus binding on a local school board, we must review the statutory bases for the panel. A teacher's right to request a fact-finding panel is contained in Code § 22.1-310(B), but subsection (C) provides that once that right is exercised, the teacher shall not have a right to a further hearing by the school board. By contrast, subsection (C) gives the school board the right to require a further hearing in any grievance.

■ Code § 22.1-312 concerns the selection of the fact-finding panel, the procedure it must follow, and its report. The teacher selects one panel member, the division superintendent selects an-

other, and those two select a third, impartial member who will chair the panel. Code § 22.1-312(A). The teacher and the division superintendent are entitled to the presence of and representation by legal counsel at all stages of the hearing. The panel is required to make a "written report which shall include its findings of fact and recommendations." Code § 22.1-312(H). The panel's "recommendations and findings of fact" are required to be based "exclusively upon the evidence presented to the panel at the hearing." Code § 22.1-312(L). Nothing in the provisions concerning a panel's report to a school board states or suggests that the panel's fact findings are binding on the school board.

■ Code § 22.1-313 concerns decisions by school boards following hearings before fact-finding panels. That provision begins by stating that a "school board shall retain its exclusive final authority over matters concerning employment and supervision of its personnel, including dismissals, suspensions and placing on probation." Code § 22.1-313(A). The statute provides further that in deciding whether to dismiss an employee who has had a hearing before a fact-finding panel, "[t]he decision of the school board shall be reached after considering the transcript, if any, and the findings of fact and recommendations of the panel and such further evidence as the school board may receive at any further hearing." Code § 22.1-313(B). The provision states further that "[i]n the event the school board's decision is at variance with the recommendation of the fact-finding panel, the school board's written decision shall include the rationale for the decision." Code § 22.1-313(C). Nothing in this provision states or suggests that the school board shall be bound by the fact findings of the panel.

According to the trial court, the legislative silence with regard to any binding effect of a panel's fact findings leads to the conclusion that such fact findings are binding on local school boards. The trial court reasoned that if the legislature did not intend to make the fact findings binding, it "would have provided for such evidence to be presented by deposition."

■ We disagree with the trial court for several reasons. First, the fact-finding panel provided for in Code §§ 22.1-310 and -312 bears no proper relationship to juries. The panel is a creature of statute; juries are part of the fabric of Anglo-Saxon jurisprudence and the right to a jury trial in Virginia is described in our Constitution as "sacred." Va. Const. art. I, § 11. The panel acts as judge, inquisitor, and fact finder; a jury's role is limited solely to

finding facts. A panel consists, by statutory design, of two partisans; all members of a jury must stand indifferent in the cause. It is a distortion of the nature and role of the statutory panel to conclude that its fact findings must be accorded the weight of a jury verdict.

■ Second, this case presents a clash between the finality of the findings of a statutorily created panel and a school board's power to discharge employees — a power which is rooted in the Constitution of Virginia. Va. Const. art. VIII, § 7. No statutory enactment can permissibly take away from a local school board its fundamental power to supervise its school system. *See Howard* v. *County School Bd.*, 203 Va. 55, 58-59, 122 S.E.2d 891, 895 (1961) (unconstitutional to divest school board of authority to decide when school property could be put up for sale); *Harrison* v. *Day*, 200 Va. 439, 452, 106 S.E.2d 636, 646 (1959) (unconstitutional to attempt, by statute, to divest local school board of authority to run schools); *County School Board* v. *Farrar*, 199 Va. 427, 433, 100 S.E.2d 26, 30 (1957) (county board of supervisors lacked power to expend proceeds of school construction bonds or to prohibit school board from expending such funds for legitimate and lawful purpose).

■ In *School Board* v. *Parham*, 218 Va. 950, 243 S.E.2d 468 (1978), we struck down a provision which sought to make local school boards subject to binding arbitration in disputes between local school boards and non-supervisory employees. In *Parham*, we wrote that "the function of applying local policies, rules, and regulations, adopted for the management of a teaching staff, is a function essential and indispensable to exercise of the power of supervision vested by § 7 of Article VIII." *Id.* at 958, 243 S.E.2d at 473. We held the binding arbitration provision unconstitutional because we were of opinion that it "effectively divests the School Board of a function indispensable to its § 7 power of supervision and transfers to an arbitration panel the authority to make a final and binding decision upon the application of the policy." *Id.* If, as the trial court believed, the findings of the statutory panel bind the Board, the statute may be constitutionally infirm; but we think that a proper reading of the statute — which we undertake below — obviates any constitutional concern.

■ Our third reason for disagreeing with the trial court is that the statute plainly contemplates that a local school board can and will, on occasion, disagree with the recommendations of a fact-

finding panel. Code § 22.1-313(C) recognizes in explicit language that the school board's decision might be "at variance with the recommendations of the fact-finding panel." Further, the subsection requires a school board to consider the transcript and any other evidence from the panel hearing. If the General Assembly intended that school boards be bound by panel fact findings, there would be little reason for requiring school boards to sift through evidence already reviewed by panels. That same subsection sets forth all that a school board must do in that situation: its "written decision shall include the rationale for the decision." *Id.* In other words, all the legislature requires is that a school board explain itself if it reaches a different conclusion. This has been done in the present case.

Thus, from a statutory standpoint, the situation is one in which the statute was written in the shadow of the Constitutional provision concerning school boards and in the shadow of our cases giving full effect to that provision. Neither the statutory provision concerning panels, nor the one concerning school-board review of panel decisions, states or suggests that panel fact findings shall be binding on a school board. The statute under which a teacher can request a panel states that once such a request is made, the teacher loses the right to a hearing before the school board. Under Anderson's approach, the statute concerning school board review of panel fact findings would have to be rewritten to provide that even if the school board disagreed with some or all of the panel fact findings, the school board would nevertheless be bound by those findings unless it granted the teacher another hearing. We do not think that such a major omission from the statute can be attributed to legislative oversight.

■ The trial court erred in holding that the panel fact findings were entitled to the weight of a jury verdict and were binding on the Board. The Board was directed by statute to consider the transcript, any other evidence, the finding of fact, and the recommendations of the panel. The General Assembly contemplated that a school board would disagree with a panel's recommendations and provided a mechanism for such disagreement. We hold, therefore, that the Board was empowered to redetermine the facts where it deemed it appropriate to do so. It follows then, with regard to the second issue, that the trial court erred in ruling that the Board was not free to conclude that class projects involving premarital sex, inter-racial violence, fascism, Molotov cocktails, and other

controversial subjects were inappropriate for a seventh grade class.

■ The next issue concerns the trial court's ruling that several of Anderson's statements were protected by the First Amendment. This issue was never put before the trial court and should not have been ruled upon by it. It was never raised by the panel; it was never discussed by the Board; it was never asserted in Anderson's bill of complaint. It was not defended by Anderson on brief and he did not mention it in oral argument. We hold that the trial court erred by relying on the First Amendment as a basis for shielding any of Anderson's remarks.[2]

■ The Board also contends that the trial court erroneously relied on matters outside the record. The trial court asserted as another basis for its decision that a confrontation between Anderson's family and the Board played a part in Anderson's dismissal and that this was unfortunate. There is no evidence of such a confrontation anywhere in the record. Anderson made no such claim in his bill of complaint. The trial court did not take any further evidence; it relied on the evidence previously taken. Therefore, it was plain error for it to go outside the record to find another reason to support its decision to reverse the Board's decision to dismiss Anderson. The very essence of trial court review of a school board's conduct is that the trial court must decide whether, given the information that had been placed before the school board, the school board's decision was justified. *See Bristol Virginia School Board* v. *Quarles*, 235 Va. 108, 119-120, 366 S.E.2d 82, 89 (1988).

■ The final issue concerns the appropriate standard of review by the trial court and whether it was complied with in this case. Once the Board gave a written statement of its rationale for dismissing Anderson, the role of the trial court was limited to determining whether the Board's decision was supported by substantial evidence. Although the trial court stated in its final decree that the Board's decision to discharge Anderson was not supported by substantial evidence, our review of the record makes clear that

---

[2] We cannot emphasize strongly enough that, though we dispose of this issue on procedural grounds, we do not mean to suggest that, had it been properly before the Court, it would have been meritorious. *See Bethel School Dist. No. 403* v. *Fraser*, 478 U.S. 675 (1986); *Connick* v. *Myers*, 461 U.S. 138 (1983); *Givhan* v. *Western Line Consol. School Dist.*, 439 U.S. 410 (1979); *Barnes* v. *Small*, 840 F.2d 972 (D.C. Cir. 1988); *Martin* v. *Parrish*, 805 F.2d 583 (5th Cir. 1986).

though the trial court was aware of the application of the substantial evidence test, all of the requirements of that test were not adhered to.

We discussed in *Quarles* — a case in which we upheld the discharge of a school superintendent — the standard of review of a trial court with regard to a decision by a local school board. We wrote as follows:

> In *Spotsylvania School Board* v. *McConnell*, 215 Va. 603, 212 S.E.2d 264 (1975), we held that *a school board's decision "will not be disturbed by the courts unless the board acted in bad faith, arbitrarily, capriciously, or in abuse of its discretion, or there is no substantial evidence to sustain its action." Id.* at 607, 212 S.E.2d at 267. We said this rule applies even when a court reviews a school board's decision in a trial *de novo*. *Id.* at 606-07, 212 S.E.2d at 267.

235 Va. at 119-20, 366 S.E.2d at 89. Earlier, in *Va. Real Estate Commission* v. *Bias*, 226 Va. 264, 269, 308 S.E.2d 123, 125 (1983), we defined substantial evidence as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. We said further that where that test is applied to a decision by an agency, the court may reject the agency's findings only if, taking the record as a whole, a reasonable mind would necessarily come to a different conclusion. *Id.*

On brief, Anderson admitted that several facts relied on by the Board were facts found by the panel. Anderson complained, however, that in dismissing him the Board also relied on further facts which the Board itself found based on the transcript and the exhibits. At the conclusion of its written rationale, the Board wrote that "[t]he individual instances cited, *taken singly or as part of a pattern*, require that the teacher be dismissed for the good of the students and the school system." (Emphasis added.) Thus, under the Board's approach any one of the facts it relied on was sufficient to warrant dismissal.

On brief, Anderson does not argue, as the trial court ruled, that Anderson's dismissal lacked substantial evidence to support it. He takes a different approach; he contends that "the School Board's decision to dismiss [him] is tainted by the consideration of factual findings either not made by the Panel, or contrary to the factual findings of the Panel." According to Anderson, the proper focus

here is not whether there was substantial evidence to support the Board's decision, but instead whether the Board acted in "bad faith, arbitrarily, capriciously, or in abuse of its discretion" in discharging Anderson. *See Spotsylvania School Board* v. *McConnell*, 215 Va. 603, 607, 212 S.E.2d 264, 268 (1975). In essence, Anderson argues that the trial court was right for the wrong reason.

■ We disagree with Anderson. The trial court did not rule that the Board acted in bad faith, arbitrarily, capriciously, or in abuse of discretion in discharging Anderson. And we find no indication of any such conduct in the record. Indeed, Anderson's abuse of discretion argument is tied inextricably to his contention that the Board had no right to review the panel record and find its own facts. Because we have ruled against Anderson on that issue, his argument on the present issue must fail in turn.

■ Turning our attention to the trial court's final decree, which held that the Board's evidence was insubstantial, we conclude that there was substantial evidence to support the Board's decision. Anderson was a teacher who was already on probation. Nevertheless, he made disparaging remarks about female colleagues, male supervisors, and the school board. He told 13-year-old students how to make a bomb; in their presence he was disrespectful to his superiors; he made a vulgar query to a young female student about kissing; he permitted his immature students to place drawings on the walls of his classroom that depicted violent themes, disrespect for the school's principal, and disdain for the school board.

It was the Board's judgment that this teacher should not be allowed to continue working with those with tender minds. This was a judgment which the Board was constitutionally empowered to make. School boards have a right to protect young people from inappropriate conduct and unsuitable language. *See Pyle* v. *Washington County School Board*, 238 So.2d 121 (Fla. App. 1970). We agree with what Chief Justice Burger wrote in *Bethel School Dist. No. 403* v. *Fraser*, 478 U.S. 675, 683 (1986):

The process of educating our youth for citizenship in public schools is not confined to books, the curriculum, and the civics classes; schools must teach by example the shared values of a civilized social order. Consciously or otherwise, teachers . . . demonstrate the appropriate form of civil dis-

course and political expression by their conduct and deport-
ment in and out of class. Inescapably, like parents, they are
role models.

We hold that the trial court erred in ruling that the Board's deci-
sion was not supported by substantial evidence.

For all the foregoing reasons, the decision of the trial court will
be reversed and final judgment will be entered here confirming the
Board's decision to dismiss Anderson.

*Reversed and final judgment.*